## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ANTHONY SISTRUNK,** | : | |
| **Petitioner** | : | **No. 1:14-cr-00070-9** |
| | : | |
| **v.** | : | **(Judge Kane)** |
| | : | |
| **UNITED STATES OF AMERICA,** | : | |
| **Respondent** | : | |

### <u>MEMORANDUM</u>

Before the Court is Petitioner Anthony Sistrunk ("Petitioner")'s motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255.  (Doc. No. 1750.)  For the following reasons, the Court will deny the motion.

## I.    BACKGROUND

In 2014, a federal grand jury returned a superseding indictment charging Petitioner and twenty codefendants (collectively, "Codefendants," and with Petitioner, "Defendants") with three counts: racketeering conspiracy ("RICO") (Count I), drug-trafficking conspiracy (Count II), and drug trafficking (Count III).[1]  (Doc. No. 78.)  The charges stemmed from Defendants' association with a violent street gang—the Southside gang, which is affiliated with the Bloods, a national street gang—to perpetrate drug trafficking and other violent acts.  (<u>Id.</u>)  The conspiracy took place over a twelve-year period and involved deadly gang violence.  (<u>Id.</u>)  Nine defendants entered pleas of guilty—eight to one count of RICO, and one to both RICO and drug-related charges.  (Doc. Nos. 1380, 1493, 1542, 1550–51, 1560, 1575, 1585.)  Twelve, including Petitioner, proceeded to a joint jury trial.  (Doc. Nos. 974–1027.)  The jury found all twelve guilty, in late 2015, of one or more charges.  (Doc. Nos. 911–34.)

---

[1]  Four (4) Codefendants were also charged with firearm-related offenses.  (Doc. No. 78.)

As to Petitioner, the jury found him guilty of RICO (Count I) and the two drug counts (Counts II–III), which involved 5 kilograms or more of cocaine and 280 grams and more of crack cocaine, heroin, and marijuana. (Doc. No. 1428.) The presentence investigation report ("PSR") assigned a base offense level of 43 for the RICO conviction based on underlying racketeering activity for which Petitioner was deemed responsible pursuant to U.S.S.G. § 2E1.1(a)(1)–(2) (providing for a base offense level of 19 "unless the offense level applicable to the underlying racketeering activity is greater"). (PSR ¶ 219.) The PSR indicated that the RICO conviction carried a statutory maximum of life imprisonment pursuant to 18 U.S.C. § 1963(a) (providing for a 20-year maximum "or [] life if the violation is based on a racketeering activity for which the maximum penalty includes life imprisonment"). (Id. ¶ 300.) The guideline range was also calculated to be life imprisonment based on a total offense level of 43 and a criminal history category of III. (Id. ¶ 301.)

Regarding the underlying racketeering activity that resulted in the higher statutory maximum and guideline range, the PSR stated as follows:

> The instant RICO offense encompasses four separate underlying racketeering categories, and 109 racketeering activities (RA) as referenced in The Offense Conduct section of this report. A defendant need not have been charged with the "underlying racketeering activity," and need not have been personally involved in the activity as long as the conduct was reasonably foreseeable to him in furtherance of the RICO enterprise. Southside was known to use threats and violence, and had access to firearms to protect their territory. Since this activity was known to all those involved, all of underlying activity noted by an 'RA' was reasonably foreseeable to the participants beginning when they personally joined Southside.

(Id. ¶ 207.)

The PSR enumerated the relevant racketeering activities, e.g., first-degree murder, attempted first-degree murder, robbery, narcotics possession/distribution. (Id. ¶¶ 208–13.) The

Court sentenced Petitioner to concurrent terms of 360 months' imprisonment on each count of which he was found guilty. (Doc. No. 1429 at 1.) The Court adopted the PSR with one exception: the Court applied a guideline range of 360 months to life based on the parties' agreement following Petitioner's withdrawal of objections to the PSR guidelines calculation that Petitioner be assessed a total offense level of 42. (Id. at 4); see (Doc. No. 1434 at 3–4).

Petitioner and nine Codefendants who proceeded to trial appealed their convictions and sentences to the United States Court of Appeals for the Third Circuit. See United States v. Williams, 974 F.3d 320, 338 (3d Cir. 2020). The Third Circuit grouped their claims on appeal into five categories: (1) Sixth Amendment challenges to this Court's closure of the courtroom to the public during voir dire; (2) challenges to the Court's in camera disposition of a challenge asserted under Batson v. Kentucky, 476 U.S. 79 (1986); (3) evidentiary challenges relating to motions to suppress evidence recovered from their residences under search warrants; (4) challenges to the sufficiency of evidence at trial; and (5) challenges to their sentences based on alleged procedural defects. See id. at 335–36. While affirming all ten Defendants' judgments of conviction, and based on the Government's concession, the Third Circuit partially vacated the judgments of sentence of eight Defendants "as to the assessment of police overtime costs," vacated the judgment of sentence of one of those eight Defendants—Hernandez—in full to permit him an opportunity to make a statement or present mitigation evidence in connection with his sentencing proceedings, and vacated another of the same group of Defendants—Scheug—as to the assessment of restitution, fines, and costs. See id. at 375, 377, 380; see also (Doc. Nos. 1637, 1637-1, 1638, 1638-1, 1639, 1639-1, 1640, 1640-1, 1641, 1641-1, 1642, 1642-1, 1643, 1643-1, 1644, 1644-1, 1645, 1645-1, 1646, 1646-1).

In October 2021, this Court issued orders effectuating the vacatur of five Defendants'

judgments of sentence as to the assessment of police overtime costs and entered corresponding

amended judgments.  (Doc. Nos. 1684–85 (Cruz), 1687–88 (Kelly), 1690–91 (Villega), 1693–94

(Atkison), 1696–97 (Petitioner).)  In December 2021, following sentencing hearings, the Court

resentenced Defendants Hernandez and Schueg and issued amended orders regarding their

judgments of sentence.  (Doc. Nos. 1705 & 1709 (Schueg), 1711 & 1712 (Hernandez).)[2]

Two claims that the Third Circuit rejected pertain to Petitioner and his § 2255 motion.

First, Petitioner argued that this Court abused its discretion when it permitted the Government to

adduce a special agent's testimony establishing that Petitioner, a South Side gang member, was

affiliated with another gang—the Bloods—based on the agent's understanding of the meaning of

a tattoo on Petitioner's arm.  See id. at 358–59.  The Third Circuit's discussion of this issue is

quoted below:

> Prior to trial, the Government announced its intention to have John Havens, a
> Special Agent with the Federal Bureau of Investigation, testify as an expert on the
> Bloods, detailing among other things their organization and symbols.  Anticipating
> a challenge to this proffer, the District Court held a Daubert hearing.  And when
> during trial the motion to exclude came, the District Court ruled in a memorandum
> opinion that most of it was admissible, but it excluded (among other things)
> testimony "as to any individual defendant except in the abstract."
>
> In support of its Blood-affiliation allegations, the Government sought to introduce
> depictions of a tattoo on [Petitioner]'s left bicep that read: "Live By The 5, Die By
> The [symbol of a gun]."  Special Agent Havens would not be shown the tattoo, the
> Government assured, but he would describe the significance of certain symbols,
> such as the number five.  [Petitioner]'s attorney objected under Rule 403, arguing
> that this singled out his client in contradiction of the Daubert decision.  The District
> Court admitted the evidence, and [Petitioner] now appeals.
>
> We find no abuse of discretion in the District Court's decision.  Cooperating
> witnesses identified [Petitioner] as a Blood.  Further, according to testimony of
> Special Agent Endy, when federal agents executed the search warrant of
> [Petitioner]'s home, they found a letter signed, "Hat Boy, Low Ridah, Brim,

---

[2]  An amended judgment was not entered as to Defendant Eatmon, whose judgment of sentence
was ordered vacated as to the police overtime costs, because his original judgment did not
include such costs.  See (Doc. No. 1504).

Kanye." Special Agent Endy testified that "Kanye" was [Petitioner]'s alias and that "Brim" was "a Blood set reference"—that is, a reference to a particular subgroup of Bloods. [Petitioner]'s argument that this testimony and evidence was minimal when compared to the voluminous trial record is irrelevant. At the very least, the testimony represents independent support, apart from the tattoo and Special Agent Havens's testimony, for the Government's theory was [Petitioner] was affiliated with the Bloods.

Nor did the District Court's decision to admit the evidence unfairly single out [Petitioner] in contradiction of the <u>Daubert</u> ruling. Under that decision, Special Agent Havens would not have testified as to [Petitioner] in particular; the tattoo would have been introduced after Special Agent Havens's testimony, and the jury would have been allowed to infer, or not infer, a connection between the tattoo and the significance of the number five among certain Bloods. In fact, the point arguably became explicit only through the efforts of [Petitioner]'s attorney, who on cross-examination presented Special Agent Havens with a picture of the tattoo. Given this course of events, we are comfortable that a reasonable person could adopt the District Court's view.

<u>See</u> <u>id.</u> (citations to the record omitted).

Second, Petitioner challenged the Court's two-day closure of the courtroom to the public during jury selection, which was based on courtroom capacity limitations. <u>See</u> <u>id.</u> at 340–48. Because none of the numerous defense attorneys involved in these criminal proceedings objected to the courtroom closure, the Third Circuit reviewed for plain error under the framework of <u>United States v. Olano</u>, 507 U.S. 725, 732 (1993).[3] Noting the Government's concession that the Court's order closing the courtroom was an "error" that was "plain," the Third Circuit found it unnecessary to address the third <u>Olano</u> prong (whether an error affects substantial rights) because, as to the fourth <u>Olano</u> prong, the error of closing the courtroom to all but court

---

[3] In <u>Olano</u>, "the Supreme Court [] described a four-part inquiry for plain-error review. There must: (1) be an 'error' that (2) is 'plain' and (3) 'affects substantial rights.'" <u>See</u> <u>Williams</u>, 974 F.3d 320, 340 (3d Cir. 2020) (quoting <u>Olano</u>, 507 U.S. at 732 (quoting Fed. R. Crim. P. 52(b))). "If these three conditions are satisfied, then it is within the sound discretion of the court of appeals to correct the forfeited error—but only if (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." <u>Id.</u> (quoting <u>Olano</u>, 507 U.S. at 732) (internal quotation marks omitted).

personnel, Defendants, trial counsel and support staff, and prospective jurors "did not 'seriously affect the fairness, integrity or public reputation of judicial proceedings . . . .'" See Williams, 974 F.3d at 341 (quoting Olano, 507 U.S. at 736).

Petitioner filed his § 2255 motion in September 2022 and subsequently filed a Notice of Election—in response to the Court's Miller notice—indicating that he wished to have the motion ruled on as filed. (Doc. No. 1750.) The Government filed a brief in opposition in November 2022 (Doc. No. 1803), and Petitioner belatedly filed a reply brief in May 2023 (Doc. No. 1842). Having been fully briefed, Petitioner's § 2255 motion is ripe for disposition. On January 17, 2025, President Joseph R. Biden Jr. commuted Petitioner's sentence to 220 months' imprisonment. (Doc. No. 1897 at 17–18.)[4] According to the Federal Bureau of Prisons Inmate Locator, his expected release date is October 27, 2030.

## II.    LEGAL STANDARD

Under 28 U.S.C. § 2255(a), a federal prisoner may file a motion requesting that the sentencing court vacate, set aside, or correct his sentence on the basis "that the sentence was imposed in violation of the Constitution or laws of the United States, or that the [C]ourt was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." See 28 U.S.C. § 2255(a).

---

[4] President Joseph R. Biden Jr.'s Executive Grant of Clemency states:

> If applicable, I also remit up to $10,000 of the unpaid balance of the fine or restitution amount imposed by the court that remains at the end of each person's respective sentence. For any individual that has a term of supervised release or other components of the sentence, I leave intact and in effect the term of supervised release imposed by the court with all its conditions and all other components of the sentence.

(Doc. No. 1897 at 17.)

However, § 2255 does not afford a remedy for all errors that may have been made at trial or during sentencing.  See United States v. Essig, 10 F.3d 968, 977 n.25 (3d Cir. 1993) (citing United States v. Addonizio, 442 U.S. 178, 185 (1979)).  Rather, § 2255 is implicated only when the alleged error raises "a fundamental defect which inherently results in a complete miscarriage of justice."  See Addonizio, 442 U.S. at 185.  Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a petitioner has one year from the time his conviction becomes final to file a § 2255 motion.  See 28 U.S.C. § 2244.

## III.    DISCUSSION

Petitioner advances the following three bases in support of his § 2255 motion:

(1)    "Counsel failed to make the appropriate assessment of the facts and give [Petitioner] the appropriate advice regarding the plea offer made by the [G]overnment.  There was an offer that came with 0–20 years and Counsel failed to know what the advisory guideline sentence would be.  Counsel never advised [Petitioner] as to what the likely sentence would have been had he accepted the offer.  Thus, he did not know what his actual sentencing exposure would be under the guidelines"; and

(2)    "[Petitioner] was denied his Fifth and Sixth Amendment rights to Due Process and effective assistance of counsel as a result of counsel[']s failure properly objection [sic] with legal arguments related to the Government introducing evidence of a tattoo 'Live By The 5'";

(3)    "[Petitioner] was denied his right to effective assistance of counsel during the trial for counsel failing to object to the closure of the court room."

(Doc. No. 1751 at 5–6, 19–20, 25.)

As his claims reflect, Petitioner seeks § 2255 relief based on the overarching assertion that the attorney who represented him ("Trial Counsel") provided constitutionally deficient representation in violation of the Sixth Amendment.  A collateral attack of a sentence based upon a claim of ineffective assistance of counsel must meet a two-part test established by the Supreme Court in Strickland v. Washington, 466 U.S. 668, 687–88, 694 (1984).  See George v. Sively,

7

254 F.3d 438, 443 (3d Cir. 2001). The first <u>Strickland</u> prong requires Petitioner to "establish first that counsel's performance was deficient." <u>See</u> <u>Jermyn v. Horn</u>, 266 F.3d 257, 282 (3d Cir. 2001). Petitioner must show that counsel made errors "so serious" that counsel was not functioning as guaranteed under the Sixth Amendment. <u>See</u> <u>id.</u> To do so, Petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. <u>See</u> <u>id.</u> (citing <u>Strickland</u>, 466 U.S. at 688). There is "a 'strong presumption' that counsel's performance was reasonable." <u>See</u> <u>id.</u>

Under the second <u>Strickland</u> prong, Petitioner "must demonstrate that he was prejudiced by counsel's errors." <u>See</u> <u>id.</u> Prejudice in this context means "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>See</u> <u>id.</u> (quoting <u>Strickland</u>, 466 U.S. at 694). Reasonable probability is defined as "a probability sufficient to undermine confidence in the outcome." <u>See</u> <u>id.</u> (quoting <u>Strickland</u>, 466 U.S. at 694).

Notably, Petitioner must make an adequate showing with respect to <u>both</u> prongs of the <u>Strickland</u> test in order to be entitled to relief. <u>See</u> <u>Strickland</u>, 466 U.S. at 686. A failure to make the required showing on either prong precludes a finding in Petitioner's favor. <u>See</u> <u>id.</u> at 700. "Because failure to satisfy either prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible," courts should address the prejudice prong first when it is dispositive of a petitioner's claims. <u>See</u> <u>United States v. Cross</u>, 308 F.3d 308, 315 (3d Cir. 2002). Each ground asserted in Petitioner's motion is discussed in turn below.

### A.    Ground One: Failure to Properly Advise Regarding Plea Offer

Ground One of Petitioner's § 2255 motion asserts that Trial Counsel was ineffective for

failing to inform him of the guideline range that would have applied had he accepted a plea offer. (Doc. No. 1751 at 3–16.) Petitioner asserts that "[d]uring the plea negotiation stage in this case the [G]overnment made an offer of 0–20 years' imprisonment" calling for him to plead guilty to RICO (Count I).[5] (Id. at 6.) According to Petitioner, Trial Counsel never "explained what the advisory guidelines sentence would have been." (Id. at 6.) Petitioner argues that if Trial Counsel had informed him of the applicable guideline range, he would have accepted the offer because the guideline range would have been far lower than the 20-year statutory maximum that the Government offered—188–235 months or, with points for acceptance of responsibility, 135–168 months. (Id.)

The Government argues that Petitioner has failed to establish either Strickland prong. As to the performance prong, the Government contends that Petitioner's claims are unavailing because Trial Counsel "advised [Petitioner] of the sentencing exposure and consequences of taking a trial verses [sic] a guilty plea." (Doc. No. 1803 at 8.) The Government asserts that it has based this representation "on communications with trial counsel during plea discussions," adding, "[w]hile maintaining attorney client privileges, trial counsel has reported to the government that if ordered by the Court written communications are available which memorialize the advice provided by counsel in this regard." (Id. at 8 n.1.) Regarding the prejudice prong, the Government maintains that Petitioner's guideline range, had he accepted the plea offer, would have been 240 months, the same as the 20-year statutory maximum provided

---

[5] Petitioner does not specifically state that the plea offer related to the RICO count, but the Government indicates that the plea offer called for him to plead guilty to RICO conspiracy with a 20-year statutory maximum (Doc. No. 1802), Petitioner does not dispute that representation in his reply brief (Doc. No. 1842), and it is RICO (and not the drug offenses) that provides for the possibility of a 20-year maximum statutory sentence absent relevant racketeering activity. Compare 18 U.S.C. § 1963(a) with 21 U.S.C. § 841(b)(1)(A).

for in the offer.  (Id. at 9.)  "If [Petitioner]'s thought process is accurately outlined in his petition

for relief," the Government maintains, "he rejected the plea then because he thought he could

have gotten 20 years in prison."  (Id. at 10.)  Thus, the Government argues that Petitioner cannot

establish prejudice because Trial Counsel informed him of the 20-year statutory maximum,

which is tantamount to informing him of the 20-year (240-month) guideline range.  (Id.)

Having considered Petitioner's arguments, the briefing of the parties, and the record of

these criminal proceedings, the Court concludes that Petitioner has failed to establish Strickland

prejudice and Ground One of his § 2255 petition is unavailing for that reason alone.  The Court

need not address the first Strickland prong and will not require the Government to produce the

communications that, according to the Government, establish that Trial Counsel informed

Petitioner of the applicable guideline range.[6]  See Gaines v. Superintendent Benner Twp. SCI, 33

F.4th 705, 712 (3d Cir. 2022) (noting that if a § 2255 movant "makes an inadequate showing as

to one of the[] [Strickland prongs], then [courts] do not need to examine the other").

Petitioner's claim in Ground One falls within the scope of Lafler v. Cooper, 132 S. Ct.

1376 (2012), and is often referred to as a "Lafler claim."  To establish a Lafler claim, Petitioner

must demonstrate that (1) "he would have accepted the plea offer if he had been aware of his

sentencing exposure"; (2) "his guilty plea would have been accepted by the court"; and (3) "the

conviction and sentence he would have received under the plea offer would have been less

severe than those resulting from the trial."  See id. at 1385.  The first prong of the Lafler claim is

essentially a more specific articulation of the second Strickland prong, which tasks the Court

with deciding whether "there is a reasonable probability that, but for counsel's unprofessional

---

[6]  In any event, it is unclear whether communications between the Government and Trial
Counsel would establish that Trial Counsel relayed the communications to Petitioner.

errors, the result of the proceeding would have been different." See Jermyn, 266 F.3d at 282 (quoting Strickland, 466 U.S. at 694).

Turning to the dispositive, second Strickland prong under Lafler, the flaw in Petitioner's claim regarding the plea offer is his mistaken belief that his guideline range, had he accepted the offer and pleaded guilty to Count I (RICO), would have been far lower than the 20-year statutory maximum attached to the offer. As the Court explained supra, the PSR, which the Court adopted except to the extent of applying the stipulated base offense level of 42, set forth a base offense level of 43 based on "underlying racketeering activity" pursuant to U.S.S.G. § 2E1.1(a). In adopting that aspect of the PSR, the Court necessarily concluded that "all of underlying activity noted by an 'RA' [i.e., racketeering activity] was reasonably foreseeable" to Petitioner and his Codefendants "beginning when they personally joined the Southside gang."[7] (Doc. No. 1201 ¶ 207.) While Petitioner stresses the fact that Trial Counsel advocated for a much lower guideline range (Doc. No. 1751 at 6), a range that Petitioner believes should have applied, the Court overruled Trial Counsel's objections to the PSR's and Government's conclusion that the underlying racketeering activity was a reasonably foreseeable consequence of Petitioner's involvement in the conspiracy.

Accordingly, the Court cannot credit Petitioner's assertion that he would have pleaded guilty to Count I had Trial Counsel informed him of the guideline range. Specifically, the Court cannot accept the proposition that Petitioner declined to plead guilty based on a statutory range of 0–20 years' imprisonment but would have accepted the plea offer and pleaded guilty to Count

---

[7] Racketeering activity can be reasonably foreseeable, and therefore ascribed to a defendant for RICO sentencing purpose, even if he "does not himself commit or agree to commit the two or more predicate acts requisite to the underlying offense." See Salinas v. United States, 522 U.S. 52, 65 (1997).

I had Trial Counsel informed him that the guideline range would have been 240 months. Indeed, in the Court's view, it is more likely that any defendant in Petitioner's position would have found a range of 0–20 years more appealing than a range of 240 months.

Contrary to Petitioner's contention, because the Court rejected Petitioner's challenges to the racketeering-activity increase in his base offense level—and applying the 20-year statutory maximum contained in the plea offer—Petitioner's guideline range would, in fact, have been 240 months had he accepted the offer. A base offense level of 43 (absent the Government's stipulation to 42) and a criminal history category of III (a category that Petitioner does not dispute) yielded an initial guideline range of life imprisonment, but the range became 240 months under U.S.S.G. § 5G1.1(a) given the 20-year statutory maximum contained in the plea offer. See § 5G1.1(a) ("[w]here the statutorily authorized maximum sentence is less than the minimum of the applicable guideline range, the statutorily authorized maximum sentence shall be the guideline sentence"). Even assuming he was assessed a base offense level of 42, the guideline range (360 months to life) would still have been above the statutory maximum, resulting in a 20-year (or 240-month) guideline range. The Court therefore rejects Petitioner's argument that "[t]here is no such guideline range as 240 to 240," and that the "correct guidelines called for something far less." (Doc. No. 1842 at 3.)

Petitioner appears to advance another argument: that the evidence submitted at trial is what allowed the Government to prove that the underlying racketeering activity was a reasonably foreseeable consequence of Petitioner's involvement of the conspiracy. (Doc. No. 1842 at 3.) Stated differently, Petitioner argues that the Government would have been unable to rely on the racketeering activity (which would have resulted in a lower base offense level), at the time he accepted the plea offer, had he done so. (Id.) The record belies this argument. Nine

Codefendants accepted a plea offer to the RICO count, and all of them, like Petitioner, were assessed with a base offense level of 43 as a result of underlying racketeering activity ascribed to them.[8]  Counsel for most of the Codefendants objected to the underlying racketeering activity, the Court overruled those objections, the only two Codefendants to receive a lower base offense level presented circumstances not present in Petitioner's case, and all but one Codefendant (who had a guideline range of 210–240) faced guideline ranges of 240 months.  See supra at n.6.  Having presided over these proceedings since their inception, the Court is certain that Petitioner would not, had he pleaded guilty to the RICO count, have faced a guideline range well below every Codefendant who pleaded guilty to the same charge.

In short, Petitioner's assertion that his guideline range would have been lower than 240 months is misplaced, and his claim that Trial Counsel should have informed him of a lower guideline range, upon which he would have accepted the plea offer, is unsupported by the record.  Accordingly, Petitioner has failed to satisfy the first Lafler prong, i.e., that he would have

---

[8]   The PSRs of every Codefendant who pleaded guilty indicated base offense levels of 43 based on underlying racketeering activity.  (Doc. Nos. 1106 ¶¶ 209, 218, 296 (Hall); 1110 ¶¶ 210, 219, 294 (Sturdivant); 1116 ¶¶ 210, 220, 303 (Rogers); 1141 ¶¶ 210, 262, 298 (Nolden); 1155 ¶¶ 209, 261, 311 (Williams, Jabree); 1165 ¶¶ 207, 218, 317 (Brown); 1170 ¶¶ 213, 223, 282 (Abney, James); 1192 ¶¶ 208, 218, 306 (Abney, Jahkeem); 1196 ¶¶ 208, 217, 305 (Payton).  Counsel for seven of these Codefendants raised specific objections to the underlying racketeering activity.  (Doc. Nos. 1238 at 2 (Brown); 1254 at 3–4 (Nolden); 1262 at 4–6 (Williams, Marquis); 1281 at 3–6 (Abney, James); 1302 at 2–6 (Payton); 1544 at 3–5 (Abney, Jahkeem); 1581 at 3 n.1 (Hall).)  As to all but two of these Codefendants, the Court adopted the PSRs over counsel's objections and applied base offense levels of 43.  (Doc. Nos. 1385 at 1 (Nolden); 1543 at 1 (Abney, James); 1555 at 1 (Abney, Jahkeem); 1556 at 1 (Williams, Marquis); 1576 at 1 (Payton); 1586 at 1 (Hall).)  As to Codefendant Sturdivant, a juvenile offender with a mitigating role in the crimes, the Court applied a base offense level of 33.  (Doc. No. 1561 at 1.)  As to Codefendant Brown, the Court applied a base offense level of 34 based on the Government's concession that Brown was involved in the offenses for a more limited period.  (Doc. Nos. 1491 at 1.)  As indicated above, both Sturdivant's and Brown's guideline ranges (210–240 and 240, respectively) were much higher than the guideline range Petitioner argues he would have faced upon pleading guilty to the same charge.

accepted the plea offer if he had been aware of his sentencing guidelines exposure.  As noted

above, Petitioner's failure to satisfy Lafler's first prong means that he fails to establish prejudice

under Strickland's second prong.  The Court will therefore deny Petitioner's § 2255 motion as to

Ground One.

## B.    Ground Two: Failure to Properly Object to Admission of Gang-Affiliation Evidence

Ground Two of Petitioner's § 2255 motion argues that Trial Counsel was ineffective for

failing to raise an appropriate objection to the admission of evidence to prove his affiliation with

the Bloods gang—namely, his "Live By The 5" tattoo and Special Agent Havens's related

testimony that the tattoo indicated Bloods membership.  (Doc. No. 1751 at 21–22.)  Petitioner

states that counsel for a Codefendant (Eugene Rice) "made a proper objection [to similar

evidence] and the [G]overnment backed out," i.e., withdrew its intention to admit the evidence.

(Id. at 22.)  Petitioner elaborates on this line of argument as follows:

> [C]ounsel should have made further objections along the lines that this tattoo lacked
> relevance to the present prosecution.  This was a [sic] not a Blood Gang issue but
> rather a group of young men from one area that came together.  Here the [C]ourt
> rejected some of the testimony from Special Agent Haven's [sic] testimony as being
> irrelevant and more prejudicial to [Petitioner] and did not allow it regarding Blood
> gang initiations.  See Dkt#860-861.[9]
>
> Moreover, this also ties into the fact that this was improper evidence and the agent
> testimony related to the tattoo that tied into "other "blood" act," [sic] evidence that

---

[9]   This citation to the record refers to the Court's Memorandum and Order resolving a joint
motion to exclude Agent Havens's testimony as to gang affiliation.  (Doc. Nos. 860–61.)  In its
Memorandum, the Court explained why it would limit Havens's testimony by prohibiting any
testimony regarding: (1) "details of the Bloods' initiation rite, a thirty-one second beating at the
hands of fellow Bloods members"; (2) "any individual defendant except in the abstract"; (3) his
opinion as to "whether any individual defendant is or is not a gang member"; and (4) his opinion
"as to whether the Bloods gang and the alleged Southside gang are affiliates."  (Doc. No. 860 at
10–11.)  The Court concluded that "any such testimony would transgress the division between
expert and fact witnesses, would be outside of Special Agent Havens's expertise, and would be
substantially more prejudicial than probative given the danger of unfairly crediting an expert's
statements and the witness's confessed lack of familiarity with the individual defendants or the
Southside gang."  (Id. at 11.)

was admitted, under Federal Rule of Evidence 404(b).  However, Counsel failed to make the proper objection when that this [sic] evidence was impermissible under 404(b) . . . .

. . . .

What this evidence did in this case is clear it painted a picture that [Petitioner] was a bad guy that he was part of a notorious street gang – the Bloods.  Here, counsel objected but should have objected on other grounds as well.  As a result of these failures the tattoo evidence was allowed in along with expert testimony that should not have been permitted by law enforcement.  Had counsel made the proper objections there is a reasonable probability that the outcome of the case would have been different.  Testimony linking [Petitioner] [to] the Bloods Gang would not have been heard by the jury.

The prejudice here is clear in its opening and during the first several weeks of trial, the [G]overnment argued that four of the defendants (Hernandez, Cruz, Villega, and Kelly) were "Blood" members.  [Petitioner] was singled out to the exclusion of eleven other co-defendants at trial as the only defendant to sport a "Blood" tattoo.  The [G]overnment was permitted to introduce a photograph of [the] "Live by the 5" tattoo; further cementing that his alleged "Blood" affiliation in the minds of the jurors with the frequently used idiom, which approaches cliché, "a picture is worth a thousand words".  In this case that picture was he is a bad guy connected to a notorious gang.

(Id. at 22–23.)

In response to Petitioner's contention that Trial Counsel was ineffective for failing to object on relevance and Rule 404(b) grounds, the Government asserts that Trial Counsel could not have been ineffective in this regard because the Court would have overruled any such objection.  (Doc. No. 1803 at 10–13.)  Noting that the superseding indictment charged an association-in-fact enterprise known as "Southside"—an affiliate gang of the Bloods—the Government asserts that evidence regarding Petitioner's Bloods-gang affiliation was admissible for two independent reasons: (1) "evidence of [Petitioner's] association with the Bloods is intrinsic to the crimes charged"; and (2) even if not intrinsic, the evidence was admissible under Rule 404(b) to "prove [Petitioner's] intent to participate in the conspiracy, which was relevant to the issue contested throughout trial."  (Id. at 12–13.)

15

On this record, the Court readily concludes that evidence of Petitioner' membership in the Bloods was intrinsic to the RICO enterprise charges, and any objection by Trial Counsel on Rule 404(b) grounds would therefore have been meritless.  Accordingly, Petitioner cannot establish that he was prejudiced by a failure to assert such an objection.  "Counsel cannot be deemed ineffective for failing to raise a meritless claim," Preston v. Superintendent Graterford SCI, 902 F.3d 365, 379 (3d Cir. 2018) (quoting Ross v. Dist. Att'y of Allegheny, 672 F.3d 198, 211 n.9 (3d Cir. 2012) (where the Court's evaluation of this contention turns on "whether a[ny] . . . objection [by Trial Counsel on the grounds identified by Petitioner] would have been meritless")).  Here, Petitioner argues that Trial Counsel was ineffective for failing to raise proper objections under both Rule 403 and Rule 404(b), each of which is discussed below.

        **1.**        **Rule 404(b)**

"Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," but "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  See Fed. R. Evid. 404(b)(1)–(2).  Rule 404(b) is "inapplicable, however, [to intrinsic evidence, i.e.,] where the evidence the government seeks to introduce is directly related to, or inextricably intertwined with, the crime charged in the indictment."  See United States v. Lillard, 354 F.3d 850, 854 (9th Cir. 2003).  "This exception applies when (1) particular acts of the defendant are part of . . . a single criminal transaction, or when (2) 'other act' evidence . . . is necessary . . . to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime." Id. (alteration in original) (cleaned up) (quoting United States v. Beckman, 298 F.3d 788, 794 (9th Cir. 2002)).

To establish the existence of a RICO conspiracy under 18 U.S.C. § 1962(d), "the Government must prove beyond a reasonable doubt that two or more people agreed to commit a crime covered by the specific conspiracy statute (that a conspiracy existed) and that the defendant knowingly and willfully participated in the agreement (that he was a member of the conspiracy)."  See Williams, 974 F.3d at 367–68 (quoting Smith, 568 U.S. 106, 110 (2013)). Given the unique nature of RICO prosecutions, the Third Circuit has recognized "[c]ourts have consistently declined to apply Rule 404(b)" in this context.  See United States v. Oliva, 790 F. App'x 343, 351 n.39 (3d Cir. 2019) (unpublished) (quoting United States v. Henley, 766 F.3d 893, 914–15 (8th Cir. 2014), for the proposition that "evidence of uncharged crimes was admissible in a RICO prosecution as proof of an enterprise, of the continuity of racketeering activity, and of the defendant's knowledge of, agreement to, and participation in the conspiracy")).

The relationship between the Bloods and Southside, as well as Defendants' involvements in each and their relationship to the RICO enterprise, were critical to the Government's burden of establishing the RICO charges.  (Doc. No. 78.)  The charging instrument made this clear.  (Id.) The Third Circuit emphasized these relationships in discussing this case on appeal.  See Williams, 974 F.3d at 335 ("South[side], the indictment alleged, had constituted since 2002 the identity of a criminal enterprise associated through its upper echelons with the Bloods, a national street gang"), 336 ("[i]t was believed that the principal sources of these drugs—and concomitantly of the increased violence—were individuals affiliated with the Bloods, who had developed the South[s]ide's existing drug trafficking into a more organized operation").

17

Defense counsel's closing arguments recognized the centrality of the same.[10]

Evidence of Petitioner's involvement with the Bloods was therefore directly relevant to establishing the elements of the RICO charges and demonstrated, inter alia, his involvement in and knowledge of the conspiracy, the existence and nature of the conspiracy, and the purpose of the enterprise. See, e.g., United States v. DiSalvo, 34 F.3d 1204, 1221 (3d Cir. 1994) (affirming admission of evidence that demonstrated participation in an association and RICO enterprise and established a "familiarity with the enterprise's illegal activities" as well as "the nature of [the defendant's] relationship with other conspirators and members of the RICO enterprise"); see also United States v. Ligambi, 890 F. Supp. 2d 564, 576 (E.D. Pa. 2012) (admitting evidence that was "intrinsic proof of the enterprise, [the] [d]efendants' knowing participation in it, and the pattern of racketeering elements of the racketeering offense"). Simply put, had Trial Counsel objected to this evidence on Rule 404(b) grounds, the Court would have overruled the objection in light of its intrinsic evidentiary value—therefore, Petitioner cannot establish that Trial Counsel's failure to make the objection resulted in prejudice to him.

### 2.      Rule 403

Regarding Petitioner's argument that Trial Counsel should have objected to the Bloods-gang-related evidence as irrelevant and unduly prejudicial, the Court notes that Trial Counsel

---

[10]   Closing arguments focused on attempts to establish that Defendants were not gang members (e.g., Doc. Nos. 1005-1 at 139, 159, 165; 1024 at 34) and had no relationship to the Bloods—all in an effort to dissuade the jury from accepting the Government's narrative that Defendants were involved in a drug conspiracy and enterprise working within a gang (Southside) affiliated with a larger gang (Bloods). As the Government noted and as Trial Counsel conceded during closing arguments, the Government was required to "prove that one of the two members of th[e] conspiracy [wa]s . . . in the RICO conspiracy, in the [Southside] gang, in the Bloods." (Doc. No. 1005-1 at 64.)

objected to the admission of this evidence under Federal Rule of Evidence 403,[11] and the Court considered the issue of relevance—and indeed specifically limited the scope of Agent Havens's testimony as more prejudicial than probative—when resolving the joint motion to exclude this evidence.  See (Doc. No. 860 at 5) (noting that "[c]ourts in the Third Circuit have long allowed experts to testify to the structure and hierarchy of relevant criminal organizations in conspiracy prosecutions"); (id. at 5–6) ("[A] court may find that an otherwise admissible expert opinion should be excluded under Federal Rule of Evidence 403 because its probative value is substantially outweighed by the potential danger of unfair prejudice, confusion, or misleading of the jury"); (id. at 10–11) (excluding certain evidence as "substantially more prejudicial than probative").  Any further or more particularized Rule 403 objections would not have persuaded the Court to exclude the evidence, particularly given that, "[i]n a conspiracy case, evidence of other bad acts, subject always to the requirements of Rule 403, can be admitted to explain the background, formation, and development of the illegal relationship."  See United States v. Scarfo, 41 F.4th 136, 179 (3d Cir. 2022) (quoting United States v. Escobar-de Jesus, 187 F.3d 148, 169 (1st Cir. 1999), and citing United States v. Reifler, 446 F.3d 65, 91–92 (2d Cir. 2006), for the proposition that "[e]vidence that a defendant had ties to organized crime may be admissible in a variety of circumstances").

The Court notes that while Trial Counsel "on cross-examination presented Special Agent Havens with a picture of [Petitioner's] tattoo," see Williams, 974 F.3d at 359, during a side bar, Trial Counsel stated that the Government "was going to introduce exhibits related to the tattoos

---

[11]  Rule 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  See Fed. R. Evid. 403.

and specifically [Petitioner]'s tattoos" and that he "d[id] not wish to open the door[] and [would be] very happy if the exhibits d[id]n't come in." (Doc. No. 1000 at 66.) Knowing that the Government intended to introduce—and that the Court was going to admit—the photograph, Trial Counsel decided to stipulate to their admission and, upon the Government's suggestion, introduce the photograph himself rather than require someone from the state prison to testify to that he or she took the photograph, which the Court noted would have been more detrimental to Petitioner's case. (Id. at 66–67, 86.) Further, Trial Counsel was able to elicit the fact that, contrary to the Government's representations during the Daubert proceedings, Agent Havens was shown the photograph before testifying. (Id. at 85–86.) Trial Counsel's introduction of the photograph enabled him to elicit Havens's testimony that the tattoo was merely an inconclusive "indicator" of a Bloods affiliation. (Id. at 86, 101.)

Based on the above, Petitioner cannot state a claim for ineffective assistance of counsel because Trial Counsel objected to the evidence introduced under Rule 403. Even assuming arguendo that Petitioner properly stated a claim for ineffective assistance of counsel, Petitioner fails to prove that he was prejudiced by the introduction of such evidence. See Cross, 308 F.3d at 315 (stating that it is preferable to address the prejudice prong first when it is dispositive of a petitioner's claim). The Court will therefore deny Petitioner's § 2255 motion as to Ground Two.

### C.    Ground Three: Failure to Object to Two-Day Courtroom Closure

Ground Three of Petitioner's motion asserts that Trial Counsel was constitutionally deficient for failing to object to the Court's decision to close the courtroom to the public for two days during voir dire. (Doc. No. 1751 at 25–27.) In this regard, the "Sixth Amendment requires that '[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial.'" See United States v. Gallman, 57 F.4th 122, 126 (3d Cir. 2023) (alteration in original)

(quoting U.S. Const. amend. VI).  Petitioner contends that "there is a reasonable probability that

the [courtroom] would not have been closed had the proper arguments been made," and that Trial

Counsel's failure to object resulted in a "structural error that requires reversal of the conviction

and sentence in this case."  (Doc. No. 1751 at 26.)  He similarly argues: "[i]t is plain that the

closing of the [courtroom] affected [Petitioner]'s substantial rights; and seriously affected the

fairness integrity or public reputation of judicial proceedings."  (Id.)  Petitioner maintains that

"[p]rejudice in this instance should have been presumed."  (Id. at 27.)

    The Government "does not contest that an objection would have been warranted"

(thereby conceding the first Strickland prong) and instead asserts only that Petitioner "cannot

establish prejudice."  (Doc. No. 1803 at 13.)  The Government relies on case law under which an

erroneous courtroom closure constitutes a "structural error" that may, under some circumstances,

warrant a presumption of prejudice, citing Barney v. Adm'r of N.J. State Prisons, 48 F.4th 162,

165 (3d Cir. 2022), where the Third Circuit stated, "[o]n habeas, not all structural errors require

automatic reversal," and also Baxter v. Superintendent Coal Twp. SCI, 998 F.3d 542, 548 (3d

Cir. 2021) (citing Weaver v. Massachusetts, 582 U.S. 286, 294 (2017), and stating that "closing

voir dire is not akin to closing the part of trial where the evidence is being adduced, and thus

prejudice [i]s not presumed" when counsel fails to object to the closure.  See (Doc. No. 1803 at

18–19.)[12]  The Government therefore argues that, absent a specific argument or evidence from

Petitioner establishing prejudice resulting from Trial Counsel's failure to object, Petitioner's

claim fails.

---

[12]  "[T]he . . . doctrines [of structural error and ineffective assistance of counsel] are intertwined;
for the reasons an error is deemed structural may influence the proper standard used to evaluate
an ineffective-assistance claim premised on the failure to object to that error."  See Baxter, 998
F.3d at 547 (alteration in original) (quoting Weaver, 582 U.S. at 294).

The Court has thoroughly reviewed the record and the parties' arguments and concludes that Petitioner has failed to satisfy the second Strickland prong.  The Court notes at the outset that controlling case law dictates that "closing voir dire" to the public does not automatically give rise to a presumption of prejudice under the relevant case law.  See Weaver, 582 U.S. at 294; Barney, 48 F.4th at 165; Baxter, 998 F.3d at 548.  Therefore, the issue of whether Petitioner has established prejudice turns on the circumstances under which the closure occurred.

Applying various factors identified by the Supreme Court and Third Circuit bearing on the issue of whether and the extent to which a courtroom closure causes prejudice, the Court finds that the circumstances here do not establish prejudice for purposes of Strickland's second prong.  In this case, as in Weaver, while "[i]t is . . . possible that potential jurors might have behaved differently if [the individuals who were prevented from viewing the trial] had been present" and that "the presence of the public might have had some bearing on juror reaction," Petitioner "offer[s] no evidence or legal argument establishing prejudice in the sense of a reasonable probability of a different outcome but for counsel's failure to object."  See Weaver, 582 U.S. at 303 (internal quotation marks omitted).  As the Third Circuit noted on appeal, "although the closure encompassed all of the jury-selection phase, those proceedings lasted only two days; the public had access to all other phases of the trial, which in total lasted longer than seven weeks."  See Williams, 974 F.3d at 346.  Further, "a transcript of the proceedings was produced and later disclosed," and "knowledge both of the media's attention to the trial and of the transcript's production (which ensures publicity in perpetuity) may have had a similar effect on the proceedings' participants as real-time public access would have had, keeping them 'keenly alive to a sense of their responsibility and to the importance of their functions.'"  See id. at 346–47 (quoting Waller v. Georgia, 467 U.S. 39, 46 (1984)).  "In addition, although the

general public was not, absent authorization, able to be present at jury selection, as in <u>Weaver</u>, 'there were many members of the venire who did not become jurors but who did observe the proceedings.'" <u>Id.</u> at 347 (quoting <u>Weaver</u>, 582 U.S. at 304). There has, moreover, "been 'no suggestion of misbehavior by the prosecutor, judge, or any other party; and no suggestion that any of the participants failed to approach their duties with the neutrality and serious purpose that our system demands.'" <u>See</u> <u>id.</u> (quoting <u>Weaver</u>, 582 U.S. at 304).

The Court also finds persuasive the Government's arguments drawing, in part, on the Third Circuit's reasoning on the issue of prejudice. In its briefing, the Government argues:

> [Petitioner] simply cannot establish prejudice. He generally alleges prejudice and notes that there were members of the public who would have been present for jury selection. To the extent that he is arguing their presence would have changed the outcome of the proceedings, the claim is without merit.

> While a public trial can benefit the accused to the extent that "the presence of interested spectators may keep the defendant's trier keenly alive to a sense of their responsibility and to the importance of their functions," <u>Williams</u>, 974 F.3d at 346 (quoting <u>Waller</u>, 467 [U.S.] at 46), here the public was excluded for two-days of jury selection in a seven-week trial. The potential for prejudice is confined to the jury selection. The transcripts of the jury selection were public. There is no indication that any juror falsified information or would have otherwise been exposed as unqualified to serve if the proceedings had been public. Nor is there evidence that the judge, prosecutors, or other court personnel engaged in misconduct during jury selection which would have been minimized or thwarted by a public proceeding.

> Additionally, there were at least twenty-five people in the defense camps who watched the jury selection process. This is a far cry from the normal public presence at jury selection. Due to the size of the venire panel and the number of defendants, the courtroom was packed with people. So, although the venire members do not qualify as the "public" for Sixth Amendment purposes, the distinction between members of the public and fellow venire members was probably lost on the individuals as they proceeded through jury selection. The combination of people in the packed courtroom, plus their oath and admonition that all they say was being stenographically recorded, placed sufficient social and legal pressure on each juror to answer honestly that the court should have confidence that allowing some members of the public to watch the proceedings would have changed nothing. This dynamic was only amplified by the twenty-five plus members of the defense camps who were present and scrutinizing the venire

members.  Any suggestion that a more public spotlight on jury selection would have resulted in a different jury is pure speculation.  There is nothing to suggest that a different jury would have resolved this case differently.

(Doc. No. 1803 at 19–21.)

For these reasons—and based on the authorities and the Third Circuit's prior discussion of the circumstances of the courtroom closure—the Court concludes that Petitioner has not established that Trial Counsel's failure to object to the two-day courtroom closure during voir dire prejudiced him.  Petitioner advances no argument that, but for Trial Counsel's failure to object to the closure, "the result of [his criminal] proceeding would have been different."  See Strickland, 466 U.S. at 694.  He simply argues that "the [courtroom] would not have been closed had the proper arguments been made" (Doc. No. 1751 at 26) and, in his reply brief, that "[w]hether a courtroom is closed or opened is never going to affect the outcome of the case or the jury" (Doc. No. 1842 at 10) ("[s]o, then how would a defendant ever show prejudice").  These allegations, when viewed under the standard and case law discussed above, do not establish Strickland prejudice resulting from the failure to object to the courtroom closure under the circumstances of this case, and the record is otherwise bereft of any indications of prejudice.[13]  The Court will therefore deny Petitioner's claim in Ground Three of his § 2255 motion.

---

[13]    The Court in Weaver (and the Third Circuit in Baxter) assumed, without deciding, that prejudice from a structural error can be established by a showing of "fundamental unfairness." See Weaver, 582 U.S. at 301 ("[T]he burden is on the defendant to show either a reasonable probability of a different outcome in his or her case or, as the Court has assumed for these purposes, to show that the particular public-trial violation was so serious as to render his or her trial fundamentally unfair." (emphasis added)); see also Baxter, 998 F.3d at 548 (assuming "that prejudice can be shown by a demonstration of fundamental unfairness" (quoting Weaver, 582 U.S. at 304)).  But "not every public-trial violation will in fact lead to a fundamentally unfair trial," see Weaver, 582 U.S. at 298, and a two-day courtroom closure during voir dire, absent any additional circumstances suggesting fundamental unfairness, does not, in the Court's view, satisfy the prejudice prong of Strickland here.

**D.    Evidentiary Hearing**

Section 2255(b) advises that a petitioner may be entitled to a hearing on his motion.  The decision to hold a hearing is wholly within the discretion of the district court.  See Gov't of V.I. v. Forte, 865 F.2d 59, 62 (3d Cir. 1989).  If "the files and records of the case conclusively show that the prisoner is entitled to no relief," the Court need not hold a hearing.  See 28 U.S.C. § 2255(b).  In determining whether a hearing must be held regarding claims of ineffective assistance of counsel, the Court must first "accept as true the nonfrivolous allegations in the petition" and then "determine whether, on the existing record, those claims that are nonfrivolous conclusively fail to show ineffective assistance of counsel."  See United States v. Dawson, 857 F.2d 923, 927–28 (3d Cir. 1988); see also United States v. Arrington, 13 F.4th 331, 334 (3d Cir. 2021) (applying the standard as set forth in Dawson).  Assuming the truth of Petitioner's nonfrivolous allegations but not of the conclusory and speculative ones, the Court finds that he has conclusively failed to establish ineffective assistance of counsel as to any of his grounds for relief.  Accordingly, the Court finds no reason to hold an evidentiary hearing in this matter.

**E.    Certificate of Appealability**

In proceedings brought under § 2255, a petitioner cannot appeal to the circuit court unless a certificate of appealability ("COA") has been issued.  A court may not issue a COA unless "the applicant has made a substantial showing of the denial of a constitutional right."  See 28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  Miller-El v. Cockrell, 537 U.S. 322 (2003).  Here, the Court concludes that jurists of reason would not find the disposition of this case debatable, and the Court will not issue a COA.

## IV.    CONCLUSION

For the foregoing reasons, the Court will deny Petitioner's § 2255 motion (Doc. No. 1750) without an evidentiary hearing and will not issue a COA.  An appropriate Order follows.

 s/ Yvette Kane
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania